REGAN, Judge.
The original defendant in this litigation, Helen Marie Cook, who is presently the wife of Russell J. Callen, Jr., filed this rule against her former husband, Arthur G. Buuck, Jr., endeavoring to obtain the permanent care, custody, and control of a minor child born of their former marriage, Cindy Ann Buuck.
After an extensive hearing in the lower court, judgment was rendered in favor of the father, dismissing Mrs. Callen’s rule for custody of the child. From that judgment, she has prosecuted this appeal.
When the trial of the foregoing rule occurred in the lower court, Cindy Ann Buuck was nine years of age and was residing in her father’s home, principally under the care of her paternal grandmother.
The record discloses that Arthur Buuck, Jr., abandoned his wife and child on September 1, 1959, and for approximately two years thereafter he failed to support both of them, and she was forced to live with her sister in order to provide sustenance for herself and the child.
In June of 1961, Mrs. Callen visited Florida with her aunt and uncle for a vacation, which was originally planned for two weeks. The child was left in the paternal grandmother’s custody for this period in compliance with her request.
*253 In the course of their vacation in Florida, Mrs. Callen’s aunt suffered a stroke, which resulted in paralysis; consequently, she remained there for approximately six weeks in order to render whatever assistance her aunt needed. When she returned to New Orleans, the paternal grandmother refused to surrender custody and persuaded Mrs. Callen to let Cindy Ann remain with her until she could obtain a job to support herself and the child who was then four years old.
Since she was unable to obtain employment with suitable pay to support both herself and the child, and since her husband was adamant in refusing to support her, Mrs. Callen permitted Cindy Ann to remain in the grandmother’s home.
In any event, the father, Arthur Buuck, Jr., subsequently obtained a default judgment of divorce herein, predicated upon a separation of two years, and in conjunction therewith, he was awarded the custody of the child. In April, 1962, Mrs. Callen married her present husband, and she has since had two children as a result of that union.
The testimony is quite clear to the effect that Mrs. Callen’s voluntary relinquishment of custody of her daughter was predicated upon her financial inability to support Cindy Ann and upon her fear that she would resent being uprooted from her residence with her father, especially in view of the fact that at that time she was developing normally.
Subsequently, however, Mrs. Callen began to notice abnormal behavorial characteristics in Cindy Ann, especially that she was not maturing as a normal child of her age would, and as a result of more inquiry, she learned of her failure in school for the 1965-1966 school term. Mrs. Callen alarmed, contacted the child’s pediatrician,. Dr. B. C. Mason, who informed her that in his opinion Cindy Ann was experiencing an emotional disturbance.
On the recommendation of the pediatrician, the child’s paternal grandmother, Mrs. Buuck, made an appointment for Cindy Ann to visit Mrs. Nancy Rummage, who is a licensed child psychologist. Mrs. Rummage administered several objective type tests normally given to. detect emotional disturbance including the Wechsler Intelligence Scale Test, the Bender Gestalt Test, and the Rorschach Test. The Wechsler Intelligence Test indicated that her intelligence was within normal limits. However, her fulfillment of various phases of the test were inconsistent, the child performing well in some aspects thereof and poorly in others. The psychologist concluded that while she possessed a normal intellectual potential, her use thereof was being interfered with by emotional factors. The psychologist further concluded from the Bender Gestalt Test that she manifested very hostile and impulsive attitudes. The results of the Rorschach Test, or ink blot test, were indicative of emotional disturbance and indicated anxiety in relation to both parental figures, especially the father figure. Mrs. Rummage’s opinion was that while the child was of normal intellectual potential, she appeared to be disturbed emotionally and to possess an immature personality structure. The child, in addition to manifesting some hostility on occasions, also displayed a defensive attitude in many aspects of the tests. With respect to^ the defensive attitude of the child, the psychologist explicitly questioned the type of environment in which she had been functioning during the past year.
In March of 1966, Mrs. Rummage recommended that Cindy Ann have immediate psychiatric treatment, and this recommendation was communicated to the child’s pediatrician, Dr. Mason. We shall refer to* the psychiatrist’s testimony at an appropriate place in this opinion.
Dr. Mason had treated Cindy Ann since she was an infant, and was for this reason very familiar with her and her environment. The doctor emphasized that his contact was almost entirely with the paternal *254 grandmother, Mrs. Buuck, and not with the child’s father which probably explains, at least to some extent, why both Dr. Mason and Mrs. Rummage concurred in the conclusion that the father was himself immature, and depended to some degree upon his mother for counsel, advice and guidance.
Dr. Mason was definite in his opinion that the child was emotionally disturbed. He also hinted rather than stated explicitly that it would probably be better for the child to reside with the mother rather than the father, but he qualified the foregoing assertion by pointing out the important fact that he had never met the mother’s second husband, visited the home in which they lived, nor observed the behavior of the children of the second marriage.
At this point, the trial judge interposed himself and asked Dr. Mason whether a change of custody from the father to the mother would be of benefit to Cindy Ann, and the doctor answered that it was his opinion that it possibly might be, but on the other hand, he also stated the possibility that such a change might panic the child when she was removed from her old home. In essence, as we understand his testimony, he summarized that whether the child was placed with the mother or whether the father remarried and took the child with him, the removal of the child from the grandmother’s care would depend for its success upon the substitute for the grandmother. In one case, the -substitute father, and in the other case, the substitute mother.
Finally, the doctor before concluding his testimony asserted that normally the greatest adjustment for a child to make is being separated from her mother rather than her father. However, he again qualified this statement by pointing out that the question revolved around the person whom the child actually regarded as her mother.
The doctor concluded by stating that the question of custody was one to be resolved by a psychiatrist who had extensively surveyed all of the circumstances and environmental characteristics involved herein and not one who had merely made a superficial examination of the child and her environment.
The only other medical evidence adduced was the testimony of Dr. Susan Sears, who qualified as an expert in child psychiatry. She related that she spent approximately one-half hour in obtaining a case history from the grandmother, and the other half hour in examining and talking to the child. Initially, the psychiatrist asserted that the child was behaving within normal limits, but on cross examination, and after confrontation with results of the tests which were made by the psychologist, she admitted that the manifestations of hostility and defensiveness as evidenced by the tests indicated that Cindy Ann was behaving abnormally and that this behavior was related to the environment in which the child resided. Despite her short contact with Cindy Ann, Dr. Sears recommended that the child remain with the father because of the “continuity” which this would afford her. The psychiatrist stressed the continuity aspect of her recommendations, and also suggested that the visitation periods with the child’s mother be reduced.[1]
The lay testimony adduced herein is particularly interesting because in a case of this sort it is usually shabby and mean. However, the whole tenor thereof was honorable and generous and it was to the effect that the mother and her second husband were good parents, were capable of rearing *255 a child properly, and were financially willing and able to incur both the expense and obligation of raising the child.
On the other hand, the testimony emanating from Dr. Mason and from several lay witnesses equally supported the fact that the child’s father, while somewhat emotionally immature, was capable of raising the child, and was financially responsible at the time of the trial. In addition thereto, the grandmother’s ability to rear the child was conceded. She is forty-eight years old, and the pediatrician expressed the opinion that while a younger woman is usually more aptly suited for rearing children, Mrs. Buuck had adapted to the problem, and had accepted it well.
Fortunately, and we say this advisedly, we are confronted with a situation in which both of the parents requesting custody are capable and responsible individuals; however, the medical evidence is in conflict with respect to the cause of the child’s emotional problems. The sole interest of this court, as was the interest of the lower court, is the welfare of the child. When the trial hereof occurred, Cindy Ann had been in the father’s home for approximately four years, and the paternal grandmother had apparently adequately substituted herself as a mother. The evidence is uncontradicted that during the two years preceding the trial in the lower court the child developed emotional problems, which included hostility, defensiveness, bed wetting, and poor performance in school.
There is nothing in the record to indicate that the child’s emotional disturbances were in fact caused by her father and grandmother or that a change of environment to the home of the mother would relieve the emotional problems plagueing the child. On the other hand, there is sufficient evidence in the record to establish a grave danger of increasing the child’s problems by uprooting her from her established residence and placing her in an unfamiliar environment. In view of these individual facts, we are of the opinion, as was the trial judge, that the welfare of the child, at present, necessitates that she remain in the home of her father where she has been residing for the last four years.
For the foregoing reasons, the judgment of the lower court is affirmed at the cost of the appellant.
Affirmed.

. It is doubtful that the trial judge attached very much significance to the psychiatrist’s testimony, in view of statements by him in the. record which offhandedly chided the psychiatrist for coming to court without having prepared the case and without having fully investigated all of the factors involved in order to support their conclusions. Moreover, the trial judge did not alter the visitation rights previously awarded to the mother.